UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:08-CR-37 |
| | ) | |
| JONATHAN N. DILLEY | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

In anticipation of his upcoming sentencing, *pro se* defendant, Jonathan N. Dilley sent the Court a letter which the undersigned determined to be a request for a variance from the advisory guidelines range in this cause. On March 16, 2009, the court held a sentencing hearing in accordance with Fed.R.Crim.P. 32(i) wherein the Government and the defendant presented their arguments regarding the appropriate sentence to be imposed in this case. At that time, the court questioned the loss calculation contained in the presentence report and ordered briefing on the issue of the amount of loss. The Defendant, through stand-by counsel, filed his Sentencing Memorandum on April 3, 2009. The Government responded on April 27, 2009. Dilley filed his own document *pro se* which is captioned "Declaration of Intention by Defendant Dilley" on March 26, 2009. On May 22, 2009, the Court held a second sentencing hearing wherein argument was heard on the positions taken by counsel in their briefs. For the following reasons, Dilley's objection to the loss calculation will be GRANTED.

**FACTUAL BACKGROUND**

Dilley was charged in a three count Superseding Indictment with presenting fictitious

1

documents in violation of 18 U.S.C. §514(a)(2) and aiding and abetting the presentation of fictitious documents. The offense conduct in this case stems from a tax protester theory commonly known as "redemption" but which has also been referred to as "acceptance for value" and "charge back." See, e.g., *United States v. Allison*, 2008 WL 302329 (5th Cir. February 4, 2008); *United States v. Palmer,* 2008 WL 4725413 (W.D. Wash. October 24, 2008); *United States v. Saldana,* 427 F.3d 298, 302 (5th Cir.2005); *Bryant v. Washington Mut. Bank,* 524 F.Supp.2d 753 (W.D.Va.2007). According to the theory, the United States government went bankrupt in 1933 when it suspended the gold standard, and no longer had collateral with which to back its debts. Thus, the theory claims, the United States pledges its current and future citizens as collateral and has accounts linked to the birth certificate number of each citizen. *Saldana,* 427 F.3d at 302. The theory states that each citizen has a "straw man" that controls the account linked to the birth certificate. Litigants espousing redemption theory claim that this account is a valuable asset worth millions and that they can gain control over their straw man and this account by making particular UCC filings. *Bryant,* 524 F.Supp.2d at 759-60. Once they have made these UCC filings, litigants relying on this theory claim that they can execute a promissory note, bill of exchange, or "sight draft" drawn on their birth certificate account at the United States Treasury and use the note as cash. *Id.,* at 759.

This is precisely what Dilley attempted to do when he sought to settle various debts owed by him, including federal tax liability, business debts, and other personal debts by drafting promissory notes and private bonds drawn on the United States Treasury for amounts well in excess of the debts owed. All told, Dilley attempted to discharge debts of $804,379.00 in this fashion. He also attempted to buy real property using a promissory note with a face value of $7,000,000. However, none of the debtors accepted the documents Dilley presented nor did Dilley receive any

2

benefit or "credit" for the debts as a result of drafting these promissory notes. With respect to the $7,000,000 promissory note, Dilley instructed the seller of the property to present the fictitious note to First Source Bank. First Source Bank refused to credit his account but instead processed the document through the Federal Reserve for investigation. As far as the court is aware, title to the real property did not change hands.

After a two day jury trial, a jury convicted Dilley on all three counts of presenting fictitious documents. Thereafter, the probation officer prepared a Presentence Investigation Report that calculates Dilley's total offense level, pursuant to the U.S.S.G. Sentencing Guidelines, to be 31 and his criminal history category to be III, leaving Dilley with a guideline range of imprisonment of 135-168 months on each count to run concurrently. To reach these conclusions, the probation officer enhanced Dilley's offense level by 22 levels after he calculated the amount of intended loss to be $21,439,216.41.[1]

At the original sentencing hearing, the undersigned questioned the validity of the above calculation given the fact that the parties agreed that there was no actual loss, and the amount of debt sought to be discharged by the fictitious instruments, despite their face value, was only $804,379.00. The court then ordered counsel to file briefs outlining their position on the amount of intended loss. The parties have now filed their briefs and presented their arguments orally to the court. Thus, the court now turns to the issue of whether the evidence supports the amount of intended loss set out in the PSR.

---

[1]Moreover, the probation officer noted in the presentence report that this amount did not include a promissory note with a face value of 100,000,000.000. However, even without the inclusion of this amount, Dilley's offense level was enhanced by 22 levels.

**DISCUSSION**[2]

Section 2B1.1 of the sentencing guidelines provides a framework for calculating the amount of loss attributable to a defendant; "loss" is the greater of the actual loss or intended loss. U.S.S.G. § 2B1.1, Application Note 3(A)(i)-(ii). The term "loss" as used in the guidelines to be "the value of the property 'taken, damaged, or destroyed,' i.e., the actual loss ... or the property the defendant intended to take" (the "intended loss"). *United States v. Johnson,* 16 F.3d 166, 170 (7th Cir.1994). "Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense. Application Note 3(A)(i) to USSG § 2B1.1. "Intended loss" is "the pecuniary harm that was intended to result from the offense" and it includes "intended pecuniary harm that would have been impossible or unlikely to occur." Application Note 3(A)(ii) to USSG § 2B1.1. In determining the intended loss amount, the district court must consider the defendant's subjective intent. *Johnson,* 16 F.3d at 172. When the intended loss exceeds the actual loss, the district court uses the intended loss in calculating the defendant's sentence. *Id.* at 170.

As recited above, the probation officer prepared a Presentence Investigation Report that calculates Dilley's total offense level to be 31, which is comprised of a base offense level of 7 and a specific offense enhancement of 22 levels. Dilley also received a 2 level enhancement because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable,

---

[2] Following, the Supreme Court's decisions in *United States v. Booker,* 543 U.S. 220 (2005) and *Rita v. United States,* --- U.S. ----, 127 S.Ct. 2456(2007), a district court is required to engage in a two-part sentencing procedure. First, the sentencing judge must be assured that the Guidelines sentence is properly calculated. After calculating the Guidelines range, a district court must give both parties an opportunity to argue for whatever sentence they deem appropriate, and then consider the factors set forth in 18 U.S.C. § 3553(a) to determine whether those factors support the sentence requested by a party. *Gall v. United States,* 128 S.Ct. 586, 596 (2007); *United States v. Dale,* 498 F.3d 604, 611-12 (7th Cir.2007). This Order is limited solely to the issue of whether the guidelines range was properly calculated. The Court will issue a separate Order considering the arguments of the parties as to an appropriate sentence after consideration of the factors in 18 U.S.C. §3553.

educational, religious, political organization or a government agency. The 22 level enhancement, which is the focus of the present briefs, was the result of the probation officer's calculation that the amount of intended loss should be calculated by looking at the face value of the fictitious documents Dilley attempted to pass. That amount is $22,010,968.00.[3]

In his brief, Dilley asserts that the proper amount of intended loss is not the face value of the promissory notes but the amount of debt Dilley sought to discharge by virtue of uttering the notes. For instance, the Defendant points out that the debts Dilley sought to discharge are listed in the PSR ¶19[4] and it is clear from the record that Dilley's intent when drafting the notes was to pay these debts. Following Dilley's theory, counsel asserts that his offense level should be 14, his criminal history category would remain at III, but his guideline range would be 21 to 27 months.[5]

To support his argument that the amount of loss should be restricted to the amount of debt Dilley sought to discharge, Dilley relies on *United States v. Berheide,* 421 F.3d 538 (7th Cir.2005) and *United States v. Fearman,* 297 F.3d 660 (7th Cir.2002). In *Berheide,* the defendant obtained a $550,000 loan from a bank, but soon thereafter was unable to pay back the loan. The remaining

---

[3]For reasons not fully explained in the PSR, the probation officer did not include a promissory note uttered by Dilley in the amount of $100,000,000.00.

[4]These debts are:
| | |
|---|---|
| GMAC Mortgage | $88,800.00 |
| GMAC Mortgage | $22,200.00 |
| Internal Revenue Service | $ 8,000.00 |
| Pop's Cars | $357,695.00 |
| Fort Financial Credit Union | $61,860.00 |
| MAFS Fort Wayne Vehicle | $95,328.00 |
| DSC | $170,496.00 |
| **Total** | **$804,379.00** |

[5]As noted at the conclusion of this Order, the Defendant's calculation erroneously calculates that new offense level even accepting his loss calculation. USSG 2B1.1 places the base offense level at 7 and thereafter, the level is enhanced for the amount of loss. Here, utilizing defense counsel's calculations of loss, the offense level of 7 would be increased by 14 levels to yield an offense level of 21.

5

balance was $521,000. He induced the bank to delay its collection efforts by fraudulently granting the bank a secured interest in property he did not own. The district court found a loss of $521,000, the amount of the outstanding loan at the time of the fraudulent security interest. On appeal, the Seventh Circuit reversed holding that "the relevant understanding of values for purposes of determining intended loss under the sentencing guidelines is that of the criminal, not that of the victim." The court went on to explain that the defendant had no actual loss because he did not have any assets to pay back the loan either before or after the forbearance agreement was signed. The court further determined that the district court improperly calculated intended loss because the defendant did not believe that his assets were of a value anywhere near $521,000:

> Berheide obviously had a better idea of the value of his business than did the bank on the day he signed the forbearance agreement. If he knew that the business assets were virtually non-existent on July 16, it is difficult to see how [the bank] was hurt by the delay in collecting the collateral. For example, if the bank would have recovered three rolls of carpet and miscellaneous fixtures on July 16, and did recover three rolls of carpet and miscellaneous fixtures in early August, the actual and intended loss is $0.

*Berheide,* 421 F.3d at 540-42.

In *Fearman,* a similar fraud case, the district court held that the actual loss was zero, but that there was an intended loss based on the amount that a third party mortgagee was planning to bid for a building. The Seventh Circuit concluded that the true measure of intended loss was in the mind of the defendant, and that there was no basis to conclude that the defendant thought the value of the building was more than zero, let alone the amount that the mortgagee intended to bid. Because the defendant knew the building was worthless, the amount the mortgagee would have offered for the building was not the appropriate amount of loss. *Fearman,* 297 F.3d at 661-62.

Comparing *Fearman* and *Berheide* to the present facts, the Defendant argues that his

6

intended loss in this case is the amount that he intended to discharge, not the excessive amounts that Dilley set out in his promissory notes because those excessive amounts bear no economic reality to the debts Dilley was trying to discharge. Moreover, during oral argument, counsel pointed out that the Dilley's creditors were in no worse position than they would have been if Dilley had not written the fictitious instruments. As counsel noted, Dilley did not have funds to pay off his debts; thus, he adopted the methodology of the redemption scheme in an attempt to pay off his debts. Either way, however, his creditors would not have collected a penny from Dilley. Thus, the intended loss must be restricted to the amount of the debts Dilley was trying to discharge.

In response, the Government argues that a conservative estimate for the intended loss is $7,812,913.72 which, after applying the remainder of the calculations would yield a total offense level of 27 with a corresponding guideline range of 108 -135 months.[6] The Government notes, for instance, that if Dilley's intent had been for the United States Treasury to pay the amount of his debts to his various creditors, then he would have written notes for only those amounts not the absurd amounts he did. Further the Government asserts that *Berheide* and *Fearman* are inapposite to the present case because the fraud schemes were dissimilar to the anti-government scheme present in redemption theory cases like this one. The Government goes on to cite two cases with redemption schemes similar to the present one wherein courts in the Sixth and Eighth Circuits upheld intended loss calculations based upon the face value of the promissory notes.

Moreover, the Government focuses on one fictitious note overlooked by the Defendant in his calculations. After signing a purchase agreement to purchase Vanover's property, Dilley drafted

---

[6]The Government appears to concede that the approximate $22,000,0000 loss calculation in the PSR, while correctly stating the face value of all the notes, is excessive.

a promissory note and gave it to Vanover for $7 million dollars (later increased to $10 million to account for a 45% tax Dilley asserted was chargeable). According to the Government, the face value of the note combined with the execution of a purchase agreement demonstrate Dilley's intent to have the bank pay $7,000,000.00, thereby leading to an intended loss of $7,000,000..

Less than a month ago, the Fifth Circuit in *United States v. Conroy*, --- F.3d ----,2009 WL 1164497 (5th Cir. May 1, 2009), emphasized that "when determining an intended loss, the district court must rely on actual, not constructive, intent." Moreover, other courts have recently observed that "a district court errs when it simply equates potential loss with intended loss without deeper analysis." *United States v. Mershon*, 2009 WL 1059549, 3 3rd Cir. April 21, ,2009) quoting*United States v. Geevers,* 226 F.3d 186, 192 (3d Cir.2000). Although the Third Circuit did not make clear what such a "deeper analysis" would entail, it noted that " '[i]ntended loss refers to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims.'" *Id.*

In this case, even if Dilley had been successful in his endeavor to pay off his debts, the most that any creditor would have "lost" as a result of his conduct is the amount of the debt Dilley owed. It is hard to fathom that any of Dilley's creditors would argue that it was entitled to more than the amount of the debt owed to them or that by presenting Dilley's notes for payment, they expected to profit from a windfall because of it. In fact, the Government acknowledges that Dilley told Special Agent Bilbrey that he did not care what happened to the excess amounts of his promissory notes – his intent was to "set off" or bring to zero his consumer debts. Government's Brief at p. 6.

As for the promissory note drafted to purchase Vanover's property, this is slightly more complicated since it is clear that Dilley's intent was for the bank to honor the $7,000,000 note and pay it to Vanover in exchange for Vanover's property. However, there is no evidence in the record

8

to support the actual value of the property or for the proposition that Dilley actually believed that the property value was $7,000,000 at the time he signed the purchase agreement. At trial, Vanover testified that he and Dilley were sitting around a fire one night and Dilley made an offer to purchase the property for $4,000,000. Vanover testified he thought Dilley's offer was a joke and responded to Dilley "if you have $4,000,000, how about $7,000,000." Thus, not even Vanover believed the value of the property supported the amount of the offer.

At least one court has noted that in determining the amount of loss, the amount must have a basis in "economic reality." *United States v. Roen*, 279 F.Supp.2d 986 (E.D.Wi. 2003) (holding that intended loss must bear a relation to economic reality). With respect to Vanover's property and the note written to purchase it, there is simply no evidence before the Court that the amount had any basis in economic reality or that Dilley believed it did. At most, any loss, intended or actual, would have to be based on the market value of the property, not some fantastical inflated figure existing only in Dilley's head. Since the court has no evidence before it as to the market value of the property Dilley intended to purchase, it cannot reasonably include the value in the intended loss calculation.

In sum, the Government has not proved by a preponderance of the evidence that Dilley intended a loss in excess of $22 million so as to support a 22 level enhancement to his base offense level. While the face value of the notes has some validity to demonstrate Dilley's intent, especially since Dilley took great pains to craft them in a genuine likeness to legitimate documents, it is clear from the record that his focus and purpose in executing this scheme was to pay debts he owed. It is therefore reasonable to cap the intended loss at the amounts the debtors would have lost had they

9

presented and relied upon the notes Dilley uttered.[7]

The court therefore concludes that the amount of intended loss in this case is $804, 379 which, in turn, leads to a 14 level enhancement to the base offense level of 7. As noted earlier in footnote 5, defense counsel erroneously failed to add the 14 level enhancement to the base offense level of 7 in performing his calculations as to the guideline sentence. Correcting this error and taking into account the remainder of the offense characteristics, Dilley's total offense level is 23, his criminal history category is III, and his corresponding guideline sentence should be 57 - 71 months.

## Conclusion

Based on the foregoing, the Defendant's objection to his guidelines calculation is GRANTED.

Entered: This 3rd day of June, 2009.

                                                                            s/ William C. Lee
                                                                            United States District Court

---

[7]On appeal, the court reviews findings of fact-such as the intended amount of loss-made in connection with sentencing for plain error. *See United States v. Jaimes-Jaimes,* 406 F.3d 845, 847 (7th Cir.2005). It is well established that "the plain error standard allows appellate courts to correct only particularly egregious errors for the purpose of preventing a miscarriage of justice." *United States v. Conley,* 291 F.3d 464, 470 (7th Cir.2002) (citing *Lieberman v. Washington,* 128 F.3d 1085, 1095 (7th Cir.1997)). Even if there has been plain error, the Court will not reverse unless the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cusimano,* 148 F.3d 824, 828 (7th Cir.1998).